CAMBRIA STEEL CO. v. McCOACH, Collector of Internal Revenue.

(District Court, E. D. Pennsylvania. July 28, 1915.)

No. 2984.

1. INTERNAL REVENUE ⬡⇒38—PENALTIES—PAYMENT UNDER DURESS—RECOVERY.

Plaintiff company leased for 999 years all the property constituting the manufacturing plant of another corporation, its manufacturing sites, mines, roads, and ways, and not to exceed 10,000 acres of coal and other lands, and took possession of the property, and took over the cash, contracts, and entire business of the lessor, agreeing to pay as rental 4 per cent. of the lessor's outstanding capital stock directly to its stockholders, and a further amount to cover the cost of maintaining the lessor's organization, and to pay all taxes on the lessor's property. On demand against the lessor for a special excise tax, for which the lessor's property was liable to a lien and distraint under Rev. St. § 3186 et seq. (Comp. St. 1913, § 5908 et seq.), and after the lessor's claim for an abatement was rejected, and to avoid the penalty threatened by the defendant as collector, and distraint and sale of the leased property, the lessee paid the taxes under protest. *Held*, that the payment was not voluntary, but was made under duress, so that the plaintiff was entitled to sue for its recovery, without regard to privity of contract between it and the defendant collector.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 83, 84; Dec. Dig. ⬡⇒38.]

2. CORPORATIONS ⬡⇒459—PROPERTY—LEASE.

Under Act Pa. Feb. 25, 1862 (P. L. 50), expressly authorizing an iron company to sell and dispose of its real and personal property, and without such authority, in the absence of express legislative restraint, the company's lease of all its property, after which it quit carrying on business, though it maintained its corporate organization out of an amount paid by the lessee, so that its only income was the rental, paid directly to its stockholders, was not ultra vires.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1811, 1812; Dec. Dig. ⬡⇒459.]

3. INTERNAL REVENUE ⬡⇒9—EXCISE ON CORPORATIONS—"DOING BUSINESS."

An iron company, which, with the approval of its stockholders, leased to another company for 999 years all the property constituting its manufacturing plant, sites, mines, and roads, and coal and other lands, not to exceed 10,000 acres, and assigned to the lessee all its cash, contracts, and entire business, in consideration of a rental equal to 4 per cent. on its outstanding stock, payable directly to its stockholders, together with an additional amount to cover the cost of maintaining its organization, after which it merely existed as landlord and lessor, and had no other income than the rent, was not "doing business," within the meaning of Corporation Tax Act Aug. 5, 1909, c. 6, 36 Stat. 112 (Comp. St. 1913, §§ 6300–6307), imposing an excise upon the doing or carrying on of business in a corporate capacity in a state.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. ⬡⇒9.

For other definitions, see Words and Phrases, First and Second Series, Doing Business.]

At Law. Action by the Cambria Steel Company against William McCoach, Collector of Internal Revenue. Upon rule for judgment for want of a sufficient affidavit of defense. Rule absolute.

⬡⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Henry, Pepper, Bodine & Pepper, of Philadelphia, Pa., for plaintiff.

Edward S. Kremp, Asst. U. S. Atty., of Reading, Pa., and Francis Fisher Kane, U. S. Atty., of Philadelphia, Pa., for defendant.

THOMPSON, District Judge. This suit is brought to recover from a former collector of internal revenue the amount paid by the plaintiff under protest as a special excise tax assessed against the Cambria Iron Company under the Corporation Tax Act of 1909, with interest.

From the statement of claim it appears that the Cambria Iron Company, hereinafter referred to as the Iron Company, on December 1, 1898, with the approval of its stockholders, entered into an agreement with the plaintiff, the Cambria Steel Company, hereinafter referred to as the Steel Company, under which it leased to the Steel Company for the term of 999 years all the property constituting the manufacturing plant and works of the Iron Company, the occupied or unoccupied manufacturing sites connected therewith, the mines and quarries connected therewith, the roads and ways connecting the same, and such additional amount in acreage of coal lands and other lands connected with the said mines and works as not to exceed in the aggregate 10,000 acres of land, and assigned, transferred, and set over to the Steel Company all its cash, bills receivable, accounts, licenses, leases, contracts, agreements, judgments, mortgages, stocks and bonds (except certain stocks and bonds through which the control of the necessary water supply and the supply of materials for manufacturing purposes was secured). Pursuant to the lease, the Iron Company delivered to the Steel Company possession of all the property mentioned.

The Steel Company, as lessee, agreed to pay as rental a sum equal to 4 per cent. upon the outstanding capital stock of the Iron Company, together with a further sum, not exceeding $5,000, to cover the cost of the maintenance of the organization of the Iron Company, the rental, except the $5,000, to be paid direct to the stockholders of the Iron Company. Since the date of the lease the Iron Company has maintained its corporate existence merely that it may exist as landlord and lessor, and to this end its stockholders have annually elected a board of directors and other officers, and it has maintained books for the transfer of its capital stock; but it has received no income other than as above set forth, and has done nothing else whatsoever, and has no quick assets, cash, or bank account.

The defendant, as collector of internal revenue, made demand upon the Iron Company for a special excise tax of $3,337.20 assessed against it by the Commissioner of Internal Revenue as a corporation having a capital stock and engaged in business in Pennsylvania. The Iron Company filed a claim for abatement of the tax, upon the ground that it was not engaged in business and not subject to the tax. The Commissioner of Internal Revenue rejected the claim for abatement, and on August 26, 1913, the defendant notified the Iron Company that the claim for abatement had been examined and rejected, and that, if the amount of the tax, together with interest at the rate of 1 per cent. per month, were not paid within 10 days, he would take steps to collect the same, with penalties. The plaintiff, in order to avoid

the penalties threatened by the collector, and because it knew that, if it did not pay the tax, the defendant would collect by distraint upon and sale of the property leased by the plaintiff from the Iron Company, paid the tax, with interest, under protest.

[1] The defenses set out in the affidavit of defense are that the plaintiff is not entitled to recover, for the reason that there was no privity of contract, express or implied, between the plaintiff and defendant in the matter of the payment or the subsequent claim for refund; that the taxes were due by the Iron Company, and were paid by the Steel Company, acting as agent for the Iron Company; that the Iron Company executed the agreement referred to as a lease without lawful authority, and that it was therefore ultra vires; that the agreement does not constitute the Steel Company tenant of the Iron Company, but its agent; and that the sums paid by the Steel Company to the Iron Company, or its stockholders, semiannually, were the Iron Company's share of income from the operations of the Iron Company's property, lands, and franchises by its agent, the Steel Company, under the agreement. The defendant also sets out certain provisions of the agreement in support of its averment that the agreement is not a lease, but a mere contract of agency, and in support of the further averment that the plaintiff, under the terms of the agreement, has been engaged in business.

Under the terms of the lease (article 6), the rental was to be paid "free from all taxes or deductions whatsoever, payment of all such taxes and charges having been assumed by said Steel Company, as in the seventh article of this lease is more particularly stated." By article 7 the Steel Company "agrees to pay all taxes, charges and assessments upon the property, stocks and capital stock, bonds, and loans of the Iron Company, and *all legal claims and demands whatsoever* which may be made against said Iron Company."

The Iron Company had by the lease stripped itself of all of its income, except that of $5,000 for maintaining its corporate existence, and the result of nonpayment by the Steel Company would have been the enforcement of payment by collection out of the property of the Iron Company in possession of the Steel Company and with which the latter was carrying on its business. It was therefore confronted with a situation amounting in law to duress when it paid the tax under protest made to the defendant.

"When taxes are paid under protest that they are being illegally exacted, or with notice that the payor contends that they are illegal and intends to institute suit to compel their repayment, a recovery in such a suit may, on occasion, be had, although, generally speaking, even a protest or notice will not avail, if the payment be made voluntarily, with full knowledge of all the circumstances, and without any coercion by the actual or threatened exercise of power possessed, or supposed to be possessed, by the party exacting or receiving the payment, over the person or property of the party making the payment, from which the latter has no other means of immediate relief than such payment." Chesebrough v. United States, 192 U. S. at page 259, 24 Sup. Ct. at page 264, 48 L. Ed. 432.

When, however, such duress is exerted under circumstances sufficient to influence the apprehensions and conduct of a prudent business man, payment of money wrongfully induced thereby ought not

to be regarded as voluntary. Robertson v. Frank Bros., 132 U. S. 17, 10 Sup. Ct. 5, 33 L. Ed. 236. What may constitute duress is stated by Judge Gray, speaking for the Circuit Court of Appeals for this circuit, in Herold v. Kahn, 159 Fed. 608, 86 C. C. A. 598:

"Every demand by one clothed with official legal authority to make the demand, imposes a certain compulsion on the one upon whom the demand is made. Such a demand is always exigent, and places a recusant in a position of disadvantage. Especially is this so in regard to the payment of taxes, state or national. The proper administration of the fiscal affairs of the government require that the payment of taxes should not be delayed by disputes as to their legality, but that the taxes should first be paid, and all questions in regard to them be determined in suits brought for their refunding. It is a wise policy, therefore, that encourages the payment under protest of disputed taxes. Though there is some conflict in the dicta of the Supreme Court, we think that the true doctrine is that, when taxes are paid under protest that they are being illegally exacted, or with notice that the payor contends that they are illegal and intends to institute suit to compel their repayment, a sufficient foundation for such a suit has been established."

In the present case, under the acts of Congress relating to collection of taxes (Rev. St. § 3186 et seq.), the property of the Iron Company of which the plaintiff was in possession under its lease was liable for the tax, together with interest, penalties, and costs. Upon failure of the Iron Company to pay the tax, the Steel Company, knowing that the Iron Company could not pay, and being bound by its agreement to pay for it, was therefore confronted with the threatened sale by the collector of the property which it held under its lease. Such circumstances were sufficient to constitute the payment one enforced by duress or compulsion, and not voluntary, and the Steel Company was therefore entitled to sue, without regard to privity of contract between it and the collector.

[2] It is contended by the defendant, however, that the agreement under which the plaintiff was possessed of the Iron Company's property did not operate as a lease, because it was ultra vires, and the District Attorney cites, in support of that contention, the language of Mr. Justice Pitney in McCoach v. Minehill Railway Co., 228 U. S. at page 304, 33 Sup. Ct. at page 423, 57 L. Ed. 842, referring to the business of the Minehill Company, as follows:

"This business, by the lease of 1896, it had turned over to the Reading Company. If that lease had been made without authorization of law, it may be that for some purposes, and possibly for the present purpose, the lessee might be deemed in law the agent of the lessor, or at least the lessor held estopped to deny such agency. But the lease was made by the express authority of the state that created the Minehill Company, conferred upon it its franchise, and imposed upon it the correlative public duties."

But the lease to the Steel Company was not made without authorization of law, for the Iron Company is expressly authorized by the Legislature under the Pennsylvania act of February 25, 1862 (P. L. 50), "to sell and dispose of the property, real and personal, of said company." But no such legislative authority was necessary to empower the Iron Company to lease its property. The law is thus stated by Mr. Justice Sharswood in Ardesco Oil Co. v. North American Oil & Mining Co., 66 Pa. at page 382:

"Corporations, unless expressly restrained by the act which establishes them or some other act of assembly, have and always have had an unlimited power over their respective properties, and may alienate and dispose of the same as fully as any individual may do in respect to his own property."

And the rule is stated to the same effect by the same authority in Pittsburgh & Connellsville Railroad Co. v. Bedford & Bridgeport Railroad Co., *81 Pa. at page 111; but it was held in that case that a railroad company could not lease to another its franchise of operating a road built or authorized to be built, unless by a legislative grant in express terms, or by necessary implication.

In citing that case in support of the contention of the defendant that the Iron Company could not without express legislative enactment dispose of its property or franchises by lease, the District Attorney has failed to distinguish between the powers of a corporation performing by authority of the Legislature a public duty, such as building and operating a railroad, and a corporation organized for private purposes, as is the Cambria Iron Company, and the language of Mr. Justice Pitney in the Minehill Case, supra, was applied to the former and not the latter class of corporations. It cannot be doubted, therefore, that the Iron Company was within its corporate rights when it leased its property to the plaintiff and quit carrying on the business which it was authorized to do by its charter.

[3] Under the decisions in McCoach v. Minehill Railway Company, 228 U. S. 295, 33 Sup. Ct. 419, 57 L. Ed. 842, Zonne v. Minneapolis Syndicate, 220 U. S. 187, 31 Sup. Ct. 361, 55 L. Ed. 428, and U. S. v. Whitridge, 231 U. S. 144, 34 Sup. Ct. 24, 58 L. Ed. 159, as applied to the facts in this case, it is clear that the Iron Company has not been engaged in business under its charter since 1898, when it leased and delivered its corporate property to the plaintiff. That the land leased to the Steel Company is not to exceed 10,000 acres, and that the Iron Company under the lease is to hold any other land which it possesses or may hereafter acquire for the purpose of supplying from time to time to the plaintiff lands and mines in lieu of lands and mines then demised, which may from time to time be surrendered to the Iron Company by the Steel Company, and that it is then to transfer the reserve lands to the Steel Company is not material, for as to these lands it is not carrying on any business, for mere ownership of lands does not constitute carrying on business, neither does it derive any income therefrom by which a tax for business might be measured. The further fact that certain stocks and securities essential to the control of the water supply and supply of materials for manufacturing purposes remain in the name of the Iron Company, and the income is paid by it to the Steel Company, is not indicative of the carrying on of business.

"The distinction is between (a) the receipt of income from outside property or investments by a company that is otherwise engaged in business, in which event the investment income may be added to the business income in order to arrive at the measure of the tax; and (b) the receipt of income from property or investments by a company that is not engaged in business, except the business of owning the property, maintaining the investments, collecting the income, and dividing it among its stockholders. In the former case the tax is payable; in the latter, not." McCoach v. Minehill Railway Co., supra.

The further provisions of the lease upon which the defendant relies relate to acts to be done by the Steel Company in its occupation and operation of the properties under the lease. None of these are in any way inconsistent with a mere relation of landlord and tenant between the parties. Under the facts in this case, therefore, it is held that the Iron Company, having leased its property to the plaintiff, and its sole income consisting of the rental, which is distributed to the Iron Company's stockholders, and its corporate existence being maintained merely for the purpose of carrying out the terms of the lease, is not doing business within the meaning of the Corporation Tax Act, and that the plaintiff, having paid under duress the tax unlawfully assessed, is entitled to recover.

Rule absolute.